IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AXIS SPECIALTY INSURANCE COMPANY | : | CIVIL ACTION |
| v. | : | |
| THE BRICKMAN GROUP LTD, LLC | : | NO. 09-3499 |

**MEMORANDUM**

Padova, J.                                                                November 18, 2010

This dispute concerns an umbrella insurance policy that Plaintiff Axis Specialty Insurance Company ("Axis") issued to Defendant Brickman Group LTD, LLC ("Brickman"). Axis has asserted claims against Brickman, seeking to recover $250,000 that it contributed to the settlement of a state court action against Brickman, arguing that Brickman had a $250,000 self-insured retention that had to be exhausted before Axis's insurance coverage applied. Meanwhile, Brickman has asserted a claim against Axis, seeking to recover amounts it expended to defend itself in the state court action. The parties have filed cross-motions for summary judgment pursuant Federal Rules of Civil Procedure 56.

For the following reasons, we grant each motion in part and deny each motion in part. Specifically, we grant Axis's motion insofar as it seeks judgment in its favor on Brickman's claim for defense costs, and grant Brickman's motion insofar as it seeks judgment in its favor on Axis's claims for reimbursement in the amount of $250,000. In all other respects, we deny both motions.

**I.    BACKGROUND**

The undisputed facts of record are that, in 2006, a woman named Deborah Peisel commenced an action in the New Jersey state courts against Home Depot and Brickman (the "Peisel Action"), alleging that she had sustained injuries in a fall in the Home Depot parking lot, due in part to

inadequate snow removal by Brickman. During the relevant time period, Brickman was self-insured for the first $250,000 of its liability, and it maintained two excess insurance policies. The first was an ACE American Insurance Company ("ACE") policy, which provided $750,000 in excess coverage for losses in excess of the "retained limit," which was Brickman's $250,000 self-insured retention ("SIR"). (R. 51;[1] R. 42, R. 55.) Brickman's second excess policy was an umbrella liability policy with Axis. The Axis policy provided $5 million of coverage in excess of the "retained limit," which it defined as the underlying ACE insurance policy providing $1 million in coverage. (R. 47; R. 30; R. 3.)

In January 2008, the insurance broker warned Axis that Brickman's defense counsel estimated a reasonable settlement value of the Pesisel Action to be in the range of $2.2 to $2.4 million, which would therefore implicate Axis's coverage. (R. 208.) Approximately six months later, on June 19, 2008, ACE "tender[ed] [the] matter" to Axis, and invited Axis to participate in the case. (R. 232.) In doing so, ACE reiterated that its policy provided $750,000 of coverage, "excess over a $250,000 self insured retention," which "ha[d] not been satisfied." (Id.) ACE further advised Axis that Brickman "has offered the remaining balance of their SIR." (Id.) In an email that same day, Axis's outside counsel, Lou Piechta, echoed back to ACE that "you are giving authority . . . to negotiate settlement for Brickman to the extent of the remaining SRI [sic] of Brickman (a figure less than 250K) plus the limits of the 750K of Ace." (R. 234.)

In late August 2008, Piechta negotiated a settlement in principle with Peisel to resolve Peisel's claims against Brickman, but not Home Depot, for $1.15 million. (See R. 240.) In an August 28, 2008 email to Mary Grace Maley, counsel for Brickman, Piechta stated that he had

---

[1] We refer to the record by using "R." plus the bates stamp on the parties' record submissions.

advised Peisel's counsel that "the 750K policy limits of ACE and 400K from Axis would fund the accepted settlement of the claims against Brickman." (R. 237.) Piechta then asked Maley to let him know whom he could contact "to verify the exhaustion of the retained limit." (Id.)

Around the same time, Piechta had a conference call with Brickman's Assistant General Counsel and others. (R. 260.) In that call, the parties discussed Brickman's SIR. (R. 261.) Piechta suggested that Brickman and Axis present a united front and "argue later about the retained limit," but counsel for Brickman did not agree to resolve the issue later. (R. 135; R. 260-61.) According to Brickman's counsel, the SIR was not the main focus of the call. Rather, the main focus of the call was Brickman's opposition to a settlement that did not involve Home Depot.[2] (R. 261.) Piechta made clear in the phone call, however, that he would settle the claim without Home Depot, in spite of Brickman's objections, because the settlement was in Axis's best interest. (Id.)

Significantly, Axis admits that, at the time of the settlement, it had not yet "formulated a position" on whether Brickman could exhaust its SIR only with indemnity payments or whether its payment of defense costs could also exhaust the SIR. (R. 187.) As the Axis claims adjuster explained, there were a number of issues that the case raised, including that little had been done to prepare for the upcoming trial and the Home Depot issues, so that Axis's "focus was not on whether or not there was a self-insured retention that [was] reduced by defense expenses, it was how we were going to get to the end result on behalf of Brickman and deal with all of these [other] issues." (R. 194.)

The parties put the settlement on the record with the New Jersey Superior Court during a

---

[2] Both ACE and Brickman opposed a settlement that did not include Home Depot, due at least in part to the fact that Home Depot had filed suit in federal court, seeking a declaratory judgment that it was entitled to coverage under Brickman's insurance. (R. 240-41.)

hearing on September 2, 2008. (R. 92-124.) Peichta attended the hearing on behalf of Axis, and Maley attended on behalf of Brickman. (R. 95.) During the hearing, the Court stated that its "understanding of the situation here is that Brickman has a – has a deductible policy with ACE of $250,000, ACE has $750,000 insurance, and then after that we have an excess carrier – in the matter." (R. 103.) Piechta subsequently described the $1.15 million settlement to the Court as follows:

> [M]y understanding is that the $750,000 policy limits of Ace are available for the settlement, that a $400,000 offer on top of that $750,000 is made upon behalf of Brickman by [Axis] pursuant to its policy of insurance, that there will not be a concern addressed at this time and in this matter regarding the self-insured retention of – of Brickman, which is represented to be $250,000, that we will work within our – our own group here, not as part of this case, and the plaintiff has not to be concerned about it, that the money will be given as set forth, 750,000 from Ace, 400,000 from [Axis] on behalf of Brickman.

(R. 110-11.) At the time of the settlement, no one had asked Brickman to contribute financially. (R. 138.)

A couple of months after the settlement, Piechta "turned [his] attention" to the question of the SIR. (R. 140.) On March 5, 2009, Piechta sent a letter to Brickman, "seek[ing] . . . payment from Brickman of the $250,000 'retained limit' which is applicable to the Peisel claim." (R. 249.) Piechta acknowledged in the letter that Brickman was taking the position that his payment of over $250,000 in defense costs had satisfied its retained limit obligation, but Piechta expressly disagreed.[3] (R. 250.) When Brickman refused to remit the requested funds, Axis, on July 31, 2009, commenced the instant action, essentially asserting that Brickman should have contributed its $250,000 in self-

---

[3]Brickman incurred approximately $400,000 in defense costs in the Peisel Action. (See Pl.'s Stmt. of Undisp. Facts ¶ 8; Def.'s Resp. to Pl.'s Stmt. of Undisp. Facts ¶ 8.)

insurance to the settlement, thereby reducing Axis's required contribution by that amount.

The Amended Complaint contains four counts, three of which survived a prior Motion to Dismiss.[4] The first of the three remaining counts asserts a claim for Declaratory Relief and seeks a declaration that (1) the ACE policy did not include within its underlying limit or retained limit any amounts expended by Brickman for its defense; (2) Axis had no duty to defend or pay any defense costs incurred by or on behalf of Brickman; and (3) Brickman was required to fund the first $250,000 of the Peisel settlement. The second remaining count alleges that Brickman breached its contract with Axis by failing to fund the first $250,000 of the Peisel settlement. The third remaining count asserts that Brickman was unjustly enriched by Axis's contribution of $400,000 to the settlement, when Axis's only obligation was $150,000, because Brickman should have paid $250,000.

Brickman filed an Answer to Axis's Complaint, denying all liability and asserting a Counterclaim for breach of contract. The Counterclaim demands judgment in Brickman's favor in the amount of $391,740.66, claiming that Axis is responsible for payment of legal fees that Brickman incurred in defending the Peisel Action.

## II. LEGAL STANDARD

Summary judgment should only be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In making this determination, we "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 276

---

[4] In a January 28, 2010 Memorandum and Order, we dismissed a claim for equitable subrogation.

(3d Cir. 2001) (internal quotation marks omitted). If a reasonable fact finder could find in the nonmovant's favor, summary judgment may not be granted. Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 130 (3d Cir. 2002).

A party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record that] it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). After the moving party has met its initial burden, the "opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in [Rule 56] – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). "'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'" Galli v. N.J. Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)). "Evidence that is merely colorable or not significantly probative is insufficient to create a genuine issue of material fact for trial." West v. Lincoln Benefit Life Co., 509 F.3d 160, 172 (3d Cir. 2007) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and El v. Southeastern Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007)).

## III. DISCUSSION

Axis argues in its summary judgment motion that the insurance contracts at issue unambiguously require Brickman to fund the first $250,000 of the Peisel settlement and that Brickman must therefore reimburse Axis in that amount. Axis further argues that judgment should be entered in its favor on Brickman's counterclaim for defense costs, because the Axis policy

unambiguously provides that Axis had no duty to defend under the circumstances of this case.

Brickman argues in response to Axis's motion, as well as in its own cross-motion for summary judgment, that Axis has no contractual or other right to seek reimbursement of the settlement monies that it paid to Peisel. Brickman also argues that it is entitled to judgment in its favor in the amount of $136,257.58 on its counterclaim for breach of contract, asserting that Axis had a clear duty to defend it under the terms of the Axis policy and, thus, must reimburse Brickman for certain defense costs it incurred. We address Brickman's counterclaim for defense costs first.

A. <u>Axis's Duty to Defend</u>

Brickman asserts in its counterclaim that Axis had a contractual duty to defend Brickman in the Peisel Action and breached that duty by failing to pay any portion of the defense costs that Brickman incurred. Brickman therefore maintains that judgment should be entered in its favor and against Axis on its counterclaim for defense costs. Axis counters in its own summary judgment motion that we should enter judgment in its favor and against Brickman on the counterclaim, because it had no duty to defend Brickman under the circumstances presented here.

Under Pennsylvania law,[5] "an insurer's duty to defend is purely contractual, and an insurer

---

[5] Axis asserts that there are potential choice of law issues in this case, because the insurance policy was issued and delivered in Pennsylvania, but the coverage issues claim arose in connection with a New Jersey lawsuit. Axis concludes, however, that no choice of law analysis is ultimately necessary on the main liability issues because New Jersey law is the same as Pennsylvania law in all material respects. <u>Hammersmith v. TIG Ins. Co.</u>, 480 F.3d 220, 230 (3d Cir. 2007) ("If two jurisdictions' laws are the same, then there is no *conflict* at all, and a choice of law analysis is unnecessary.") In contrast, Brickman does not acknowledge or address the potential choice of law question in its summary judgment papers and simply relies primarily on Pennsylvania law. The parties therefore appear to be in agreement that it is appropriate to apply Pennsylvania law to the issues before us. Moreover, it seems apparent that Pennsylvania has the most significant relationship with this dispute due to the insured's status as a Pennsylvania company, the insurance broker's Pennsylvania address, and the delivery of the Axis policy to Brickman in Pennsylvania. <u>See</u> <u>generally</u> <u>id.</u> at 232-35 (employing a most significant relationship analysis). Accordingly, we apply

has no duty to defend unless the obligation is expressed in the policy." Genaeya Corp. v. Harco Nat. Ins. Co., 991 A.2d 342, 347 (Pa. Super. Ct. 2010) (citation omitted); see also AstenJohnson, Inc. v. Columbia Cas. Co, 562 F.3d 213, 229 (3d Cir. 2009) (stating that an insurer has no obligation to defend an insured "in the absence of contractual language creating such an obligation" (citations omitted)). In interpreting a policy, the court's primary consideration is "to ascertain the intent of the parties as manifested by the language of the written instrument." Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983). The "insurance policy must be read as a whole and construed according to the plain meaning of its terms." C.H. Heist Caribe Corp. v. Am. Home Assurance Co., 640 F.2d 479, 481 (3d Cir. 1981). The court must enforce the plain language of the policy if its terms are clear and unambiguous. Standard Venetian Blind, 469 A.2d at 566.

Brickman relies on the following paragraphs of the Axis policy to support its argument that Axis had a duty to defend:

> 2. We will have the right and duty to defend the insured against "suits" seeking damages for "bodily injury", "property damage" or "personal and advertising injury" covered by this policy when the "underlying insurance" does not provide such coverage.
>
> 3. We will also have the right and duty to defend the insured against "suits" seeking damages for "bodily injury", "property damage", "personal and advertising injury" or damages resulting from wrongful acts, errors or omissions arising out of the conduct of your business and covered by this policy, when the limits of insurance of the "underlying insurance" have been exhausted by payment of damages.

(R. 7 at ¶¶ 2-3.) We address Axis's defense obligations under each paragraph.

---

Pennsylvania law.

### 1. Duty under Paragraph 3

Brickman first argues that paragraph 3 imposed on Axis a duty to defend that arose no later than January of 2008, when Peisel made a settlement demand of $5,000,000, making clear that the limits of the Ace insurance policy would be exhausted. Rather than focusing on the language of the policy provision in advancing this argument, Brickman relies almost exclusively on Cooper Laboratories, Inc. v. International Surplus Lines Insurance Co., 802 F.2d 667 (3d Cir. 1986) ("Cooper Labs"), which held that an excess insurer's duty to defend arose when the insurer "was confronted with" a demand in excess of the underlying self-insured retention, "which put its coverage at stake." Id. at 676. That case, however, involved an insurance policy that required the excess insurer to defend if the "bodily injury . . . is included within the products hazard," without any additional qualifying language. Id. at 675. In contrast, paragraph 3 of the Axis policy, as set forth above, requires Axis to defend only "when the limits of insurance of the 'underlying insurance' have been exhausted by payment of damages." (R. 7 at ¶ 3 (emphasis added).) Accordingly, contrary to Brickman's assertion, the holding in Cooper Labs is simply not controlling here, because it is based on a policy provision that is readily distinguishable from paragraph 3 in the Axis policy.

Moreover, we find that under the plain language of paragraph 3, Axis did not have a duty to defend Brickman until the underlying insurance, i.e., the ACE policy, had "been exhausted by the payment of damages." (Id.) In this case, ACE paid no damages until final settlement of Peisel's claims against Brickman in September 2008. Accordingly, no duty to defend arose under paragraph 3 before September of 2008, at the earliest. Cf. Virginia Sur. Ins. Co. v. RSUI Indem. Co., Civ. A. No. 09-928, 2009 WL 4282198, at *4, *7 (D. Ariz. Nov. 25, 2009) (holding that, where excess policy provided that duty to defend did not arise until the underlying insurance was "exhausted by

payments of judgments, settlements and any cost or expense subject to such limit," excess insurer's duty to defend did not arise until the payment of the settlement.) Furthermore, there is no record evidence that Brickman incurred any defense costs after the settlement. We therefore reject Brickman's arguments that paragraph 3 gave rise to a duty to defend in January of 2008, and that Axis was therefore obligated to pay some portion of Brickman's defense costs after that date.

    2.    <u>Duty under Paragraph 2</u>

Brickman next argues that Axis had a duty to defend under paragraph 2 of the Axis policy, which provides that Axis had "the right and duty to defend against 'suits' seeking damages for 'bodily injury' . . . covered by this policy when the 'underlying insurance' does not provide such coverage." (R. 7 at ¶ 2.) Brickman maintains that this paragraph's reference to "such coverage" is ambiguous, because it could refer either to coverage for damages or to coverage for defense costs. It therefore argues that, construing the policy in favor of the insured, we must interpret "such coverage" to mean the duty to defend and conclude that Axis had a duty to defend when the underlying insurance did not include a duty to defend. Furthermore, because it is undisputed that the ACE policy did not include a duty to defend, Brickman maintains that Axis had the duty to defend.

Axis responds that it is "difficult to imagine" a "more strained interpretation and construction" of this policy provision. (Axis Br. in Resp. to Brickman's Summ. Judg. Mot. at 7.) It argues that "[t]he policy does not insure a duty to defend, it insures claims for damages arising from bodily injury . . . ." (<u>Id.</u>) Axis therefore argues that the only reasonable reading of the provision is that Axis may have a duty to defend claims for damages when the underlying policy does not provide any damages coverage.

Contractual language is ambiguous if "it is reasonably susceptible of different constructions and capable of being understood in more than one sense." Hutchison v. Sunbeam Coal Co., 519 A.2d 385, 390 (Pa. 1986) (citations omitted). A "court should read policy provisions to avoid ambiguities, if possible, and not torture the language to create them." St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co., 655 F.2d 521, 524 (3d Cir. 1981). "Additionally, an ambiguity does not exist simply because the parties disagree on the proper construction to be given a particular policy provision." Neuhard v. Traveler's Ins. Co., 831 A.2d 602, 605 (Pa. Super. Ct. 2003) (citation omitted). That said, "[w]here a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement." Standard Venetian Blind, 469 A.2d at 566.

In this case, we find that the term "such coverage" unambiguously refers back to "damages for bodily injury . . . covered by this policy," not to the duty to defend. We reach this conclusion for a number of reasons. First, we find it only logical that "such coverage" pertains to the damages "covered by this policy" as both phrases use the root word "cover." Second, we note that, as a grammatical matter, "'a limiting clause in a policy is to be confined to the last antecedent unless the context or evident meaning requires a different construction.'" Contrans, Inc. v. Ryder Truck Rental, Inc., 836 F.2d 163, 167 (3d Cir. 1987) (quoting 13 Appleman, Insurance Law and Practice, § 7387 at 181-82 (1976), and citing Black's Law Dictionary 794 (5th ed. 1979)). Third, we observe that only this construction is consistent with the common understanding of the duty to defend as "a distinct obligation, separate and apart from the insurer's duty to provide coverage." Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc., 2 A.3d 526, 540-41 (Pa. 2010) (emphasis added) (citations omitted); Travelers Prop. Cas. Co. of America v. Mericle, Civ. A. No. 09-1747, 2010 WL 3505117,

at *6 (M.D. Pa. Aug. 31, 2010) ("An insurance carrier's duty to defend is distinct from its duty to provide coverage"), as well as the general and well-accepted principle that "'the obligation to defend arises whenever the complaint filed by the injured party may *potentially* come within the coverage of the policy.'" Erie Ins. Exch. v. Transamerica Ins. Co., 533 A.2d 1363, 1368 (Pa. 1987) (quoting Gedeon v. State Farm Mut. Auto. Ins. Co., 188 A.2d 320, 321-22 (Pa. 1963)) (underlining added). Finally, we observe that our construction (unlike that which Brickman advances) permits the duty to defend in paragraph 3 to logically coexist with, and complement, the companion duty to defend in paragraph 2, in that paragraph 2 defines the duty to defend when there is no damages coverage in the underlying insurance and paragraph 3 addresses the duty to defend when there is damages coverage in the underlying insurance.

In the end, we find that Brickman's interpretation of paragraph 2 tortures the policy language to create an ambiguity where none exists. Curiously, neither party cites to Section II, paragraph 4 of the Axis policy, which clearly states that Axis has no duty to defend when there is underlying insurance, such as the Ace policy. Specifically, that provision states:

> We have no duty to defend any claim or "suit" if there is "underlying insurance" or applicable other insurance. . . .
>
> However, we may, at our discretion and at our expense, participate with the insured or any provider of "underlying insurance" or other insurance in the investigation, settlement or defense of any claim or "suit" which is likely to involve this insurance.

(R. 9 at ¶ 4.) The plain language of this provisions is consistent with our interpretation of paragraph 2, and is not consistent with Brickman's interpretation of that paragraph. Given that we must read the Axis policy as a whole and construe it according to the plain language of all of its terms, see C.H. Heist, 640 F.2d at 481; Standard Venetian Blind, 469 A.2d at 566, we hold that Axis had no duty to

defend Brickman under paragraph 2 unless the ACE policy did not provide coverage for the bodily injury damages claimed in the Peisel action. Because the ACE policy undisputedly did provide coverage for Peisel's bodily injury damages, Axis had no duty to defend under this provision.

For the foregoing reasons, we conclude that Axis had no duty to defend Brickman under either paragraph 2 or paragraph 3 of the Axis policy. We therefore enter judgment in Axis's favor on Brickman's counterclaim for defense costs.

B. Brickman's SIR

Axis argues in its motion for summary judgment that Brickman was contractually responsible for the first $250,000 of the Peisel settlement, its SIR, and therefore must reimburse Axis that amount, either under a breach of contract or unjust enrichment theory. Brickman does not dispute that it was obligated under the policy terms to contribute the first $250,000 in indemnity to any settlement, but nevertheless argues that Axis cannot now seek reimbursement of that amount, because it has no right – either contractual or otherwise – to pursue reimbursement after voluntarily funding the settlement. For the following reasons, we agree with Brickman that Axis cannot seek reimbursement of the $250,000 that it contributed to the settlement under the circumstances presented here.

"[T]he question of whether an insurer is entitled to reimbursement for settlement payments has not received extensive judicial scrutiny." Utica Mutual Insurance Co. v. Rohm & Haas Co., 683 F. Supp. 2d 368, 376 (E.D. Pa. 2010). Indeed, we have been unable to identify any Pennsylvania state court opinion directly addressing this issue. There is, however, authority interpreting Pennsylvania law with respect to two analogous issues: (1) whether an insurer is entitled to reimbursement of defense costs when it is subsequently determined that the insured was entitled to

no indemnity coverage under the insurance policy, see American & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc., 2 A.3d 526 (Pa. 2010) ("Jerry's Sport"); and (2) whether an insurer is entitled to be reimbursed for a state court judgment it paid for non-covered claims, see Essex Insurance Co. v. RMJC, Inc., 306 F. App'x 749 (3d Cir. 2009) ("Essex").

In Jerry's Sport, the Pennsylvania Supreme Court held that "an insurer is not entitled to be reimbursed for defense costs absent an express provision in the written insurance contract" pertaining to reimbursement. Id. at 529 (emphasis added). The Court reasoned that it is the mere possibility that a claim falls within the insurance policy that triggers an insurer's duty to defend its insured. Id. at 541-42. As the Court explained, the subsequent judicial resolution of a coverage question in favor of the insurer does not "retroactively eliminate the insurer's duty to defend the insured during the period of uncertainty." Id. at 542 (citation omitted). It further stated that "[i]t would amount to a retroactive erosion of the broad duty to defend in Pennsylvania [to] mak[e] the right and duty to defend contingent upon a court's determination that a complaint alleged covered claims, and would therefore narrow Pennsylvania's long-standing view that the duty to defend is broader than the duty to indemnify." Id. at 544.

Having concluded that the duty to defend was not contingent on a judicial determination of indemnity coverage, the Jerry's Sport court nevertheless looked for some alternative basis on which to find that the insurer could be reimbursed for the costs it incurred in fulfilling its contractual duty to defend. It first suggested that an insurer might be entitled to reimbursement if its policy contained "a provision providing for reimbursement of defense costs under any circumstances," but made clear that, in the absence of such a provision, no right to reimbursement could be grounded on the policy terms. Id. at 544. It next considered whether a right to reimbursement could be created with a

reservation of rights letter, but concluded that "permitting reimbursement by reservation of rights, absent an insurance policy provision authorizing the right in the first place, [would be] tantamount to allowing the insurer to extract a unilateral amendment to the insurance contract." Id. The Court further concluded that the insurer could not obtain reimbursement under an unjust enrichment theory, because an insurer's provision of a defense benefits not only the insured, but also the insurer, who protects itself from any potential indemnity exposure as well as the potential of a bad faith claim based on an unjustified failure to provide a defense. Id. at 545; see also id. at 546 ("It would be unjust to require Insured to reimburse [the insurer] for the cost of the defense where [the insurer] invoked its right to defend in part to protect its own interest."). Finally, the Court observed that "recognizing a right to reimbursement outside of the policy would empower each insurer to design its own right of reimbursement subject only to the insurer's designs," which would "open the door to . . . maneuvering by insurance companies at their policyholders' expense." Id. at 546.

In Essex, Essex Insurance Company brought a restitution claim against its insured, RMJC, Inc. ("RJMC"), after it paid a state court judgment on RMJC's behalf.[6] 306 F. App'x at 750. After finding that Essex had no duty to indemnify RMJC under the terms of the policy, the Court considered Essex's restitution claim. Id. at 753. Significantly, the court was not troubled by the fact

---

[6]Although Essex involved a "restitution" claim and our case involves claims for breach of contract and unjust enrichment, we find that unjust enrichment and restitution are so similar as to necessitate parallel analyses. Compare Stoeckinger v. Presidential Fin. Corp., 948 A.2d 828, 833 (Pa. Super. Ct. 2008) (identifying elements of unjust enrichment claim as (1) benefits conferred on defendant by plaintiff, (2) appreciation of the benefits by defendant, and (3) acceptance and retention of the benefits by defendant such that it would be inequitable to retain the benefit without payment), with Essex, 306 F. App'x at 753 ("A party can obtain the equitable remedy of restitution where the claimant can show that a benefit was wrongfully secured or passively received, and that it would be unconscionable for the party receiving the benefit to retain it without payment. We must focus not on the intention of the parties but on the extent to which the enrichment is unjust." (internal quotation omitted)).

-15-

that the insurance contract was silent on the question of reimbursement for unobligated payments, stating that "where . . . the terms of the contract do not address the compensation owed to a plaintiff for a particular benefit conferred on the defendant, the plaintiff may obtain restitution if the defendant would be unjustly enriched by retaining that benefit." Id. at 754. The Court further rejected the insured's argument that Essex could not recoup the amount of the state court judgment because it paid the judgment voluntarily under a mistake of law, concluding instead that Essex had paid the judgment not due to a mistake of law but, rather, because there were factual questions that needed to be resolved before ascertaining whether it had a duty to indemnify RMJC. Id. at 754-55 (recognizing that Pennsylvania law disallows recovery of payments made under a mistake of law, such as a misinterpretation of contract language, but permits recovery of payments made without full knowledge of the facts).

The Court further stated that "[p]olicy considerations also weigh in favor of allowing recovery of indemnity payments" made in connection with a judgment, where an insurer has undertaken the legal defense of its insured. Id. at 755. As the Court explained, "allowing restitution for an insurer's defense or settlement costs risks altering the incentives the law has created for insurers to provide vigorous and effective defenses." Id. (emphasis added). In contrast, the incentive structure is not disrupted "by permitting an insurer exhaustively to defend its insured under a reservation of rights, pay a resultant judgment, and then litigate its duty to indemnify." Id. According to the Court, this is because satisfaction of a state-court judgment "protect[s] the interests of all relevant parties" by ensuring that the plaintiff in the state court action suffers no delay in receiving compensation, and limiting the post-judgment interest for which the insured and/or insurer would become liable if the judgment were not promptly paid. Id. The Court further observed that

"RMJC appears to miss the irony that it reaped this very benefit in this case, but would not have under the rule it urges[,]" i.e., a rule that the insurer cannot recover payments after they are made, because "Essex would almost certainly have declined to pay the judgment for fear of foreclosing its ability to seek restitution," leaving RMJC "saddled with a significantly larger debt to [the state court plaintiff] once RMJC was adjudged to have no duty of indemnification." Id. at 755 (footnote omitted).

Finally, the court observed that "RMJC was plainly on notice at the time of the payment that Essex disputed its obligations to indemnify," because Essex had already filed a federal declaratory judgment action. Id. at 756. It concluded, therefore, that "[a]warding restitution to Essex . . . works no unfairness to RMJC, which could not have reasonably changed its position in reliance on Essex's payment. Precluding recovery, on the other hand, would create inefficient incentives and disservice the interests of insurers, insureds, and injured third parties." Id. at 756 (footnote omitted). For all of these reasons, the Essex court permitted Essex to seek reimbursement in that case.

Based on these two cases, we conclude that, under Pennsylvania law, an insurer who makes a settlement payment on its insured's behalf may assert an unjust enrichment claim for reimbursement if it is determined after the payment is made that the insurer was not obligated to make the payment under the terms of the insurance policy. The insurer may not, however, proceed on a pure breach of contract theory if there is no specific provision in the insurance policy that provides for reimbursement claims. Moreover, in order to prevail on an unjust enrichment claim for reimbursement, the insurer must establish that (1) it did not make the payment due to a mistake of law; (2) the insured was on notice at the time of the payment that the insurer disputed its obligation to pay; (3) it did not make the payment primarily to protect its own interest; and (4) permitting

reimbursement under the circumstances presented would not upset the delicate incentive structure inherent in the insurer/insured relationship.

Applying these principles to the case at hand, we conclude that Axis is not entitled to reimbursement under the circumstances of this case. First, it is undisputed that there is no explicit right to reimbursement in the Axis Policy. Second, the record is clear that, prior to Axis's funding of the settlement, Axis had never sent Brickman a reservation of rights letter or otherwise explicitly advised Brickman that it disputed its obligation to pay the first $250,000 of the settlement. Indeed, as Axis concedes, at the time of the settlement, it had not even formulated a position as to whether the insurance policy required Brickman to contribute. (See R. 187 (insurance adjuster's testimony that, at the time of the settlement, Axis had not formulated a position on how the SIR could be exhausted.); R. 137 (Piechta's testimony that, at the time of settlement, he had not formed a conclusion as to whether Brickman's defense expenses exhausted the SIR)). While Axis did communicate to Brickman that it had questions regarding Brickman's satisfaction of its SIR obligations, it also repeatedly indicated that understood that Brickman's payments of defense costs had at least partially satisfied those obligations. (See, e.g., R. 234 (June 19, 2008 email from Piechta, stating that ACE was "giving authority . . . to negotiate settlement for Brickman to the extent of the remaining SRI (a figure less than 250K) plus the limits of the 750K of Ace"); and R. 237 (Aug. 28, 2008 email from Piechta, asking who could "verify the exhaustion of the retained limit?")). To the extent that Axis previously believed that Brickman's defense payments could satisfy the SIR, and yet now maintains that payment of defense costs did not satisfy the SIR, it must concede that it was proceeding under a mistake of law, which, as explained above, precludes recovery. See Essex, 306 F. App'x at 754; see also Acme Markets, Inc. v. Valley View Shopping

Ctr., Inc., 493 A.2d 736, 737 (Pa. Super. Ct. 1985) ("[M]oney paid voluntarily, although under a mistake of law as to the interpretation of a contract, cannot be recovered." (citation omitted)).

Finally, we also conclude, based on the undisputed record evidence, that Axis's payment of the settlement was primarily for its own benefit, and that permitting it to now recover any portion of that payment from Brickman would upset the incentive structure inherent in the insurer/insured relationship. In this regard, we reiterate that Axis settled the case for an amount well within its policy limits, thereby greatly limiting its own exposure should the case proceed to trial. Moreover, the record reflects that Brickman was not happy with the terms of the settlement, as it desired a global settlement that also included Home Depot. Axis, however, settled the case over Brickman's objections, essentially threatening to contribute nothing to the settlement if Brickman did not cooperate. (See R. 261; R. 434 (Piechta states in response to concerns regarding Home Depot's exclusion from the settlement: "If Brickman does not want its coverage from Axis, let them tell me.").) In doing so, Axis put Brickman in an impossible position. As a Court in this District has explained in a similar circumstance:

> When an insurer funds a settlement, the insurer benefits because settlement . . . caps the insurer's risk of liability, and may insulate an insurer from a future bad faith claim by the insured. If courts added to this list of benefits for the insurer by actively grafting on to the insurer-insured relationship an implied right to reimbursement for settlement payments in this situation, an insured would be left without any commercially reasonable choices. The insured would be forced to either accept the insurer's unilateral conditions on funding the settlement, fund the settlement itself, or forego settlement altogether thereby risking loss of a potential reasonable settlement within policy limits.

Utica, 683 F. Supp. 2d at 376. We therefore conclude that it would not be inequitable for Brickman to retain the benefit of Axis's payment.

For all of these reasons, we conclude that Pennsylvania law does not permit Axis to recover from Brickman any of the money that it paid to settle the Peisel Action. We therefore enter judgment in favor of Brickman on Axis's declaratory judgment, breach of contract and unjust enrichment claims.

**IV. CONCLUSION**

For the foregoing reasons, we grant Axis's motion insofar as it seeks judgment in its favor on Brickman's claim for defense costs, and grant Brickman's motion insofar as it seeks judgment in its favor on Axis's claims for reimbursement of money it expended in settlement. In all other respects, we deny the parties' motions. We therefore enter judgment in favor of Brickman and against Axis on Axis's claims against Brickman, and enter judgment in favor of Axis and against Brickman on Brickman's counterclaim. An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

John R. Padova, J.